**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

FILED

FEB 1 2 2018

CLERK, US DISTRICT COURT
NORFOLK, VA

**Jupiter Dennell Wilson,**

        **Plaintiff,**

                            **CIVIL ACTION NO. 2:16cv301**
**v.**                       **CIVIL ACTION NO. 2:16cv629**
                            **CIVIL ACTION NO. 2:16cv711**

**City of Chesapeake,**

        **Defendant.**

## OPINION AND ORDER

In this consolidated employment discrimination action filed by Firefighter Jupiter Dennell Wilson, the City of Chesapeake moved for summary judgment (ECF No. 52). The City argues the evidence is insufficient to permit a reasonable juror to conclude Wilson was subject to an adverse employment action as a result of his age or race, or in retaliation for prior complaints of discrimination. See Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") (ECF No. 53). The City's 50-page motion is supported by declarations from fifteen witnesses, Wilson's own deposition, and numerous exhibits. Wilson filed a brief opposing summary judgment, attaching his own sworn declaration in support. (ECF No. 58).

After reviewing the exhibits and evidence the parties have submitted in contest of the summary judgment motion, this court concludes that Wilson has not produced evidence of adverse employment actions or of a similarly situated comparator necessary to establish a prima facie case, or to rebut the City's proffered non-discriminatory reasons for the choices it has made regarding Wilson's training and promotion. Accordingly, as explained in greater detail below, the court will GRANT the City's Motion for Summary Judgment (ECF No. 52).

# I. FACTUAL AND PROCEDURAL HISTORY

Jupiter Wilson is a black man over the age of 40. He has been and remains employed as a firefighter with the Chesapeake Fire Department ("CFD"), where he has worked since 1996. The events relevant to his claims in this court all occurred during and after 2011. The court summarizes those events below, relying on the parties' declarations and an agreed stipulation of facts—but viewing any dispute of fact in the light most favorable to Wilson.

Wilson filed a number of claims against the City of Chesapeake with the Equal Employment Opportunity Commission ("EEOC"), all related to his access to training and eligibility for promotion. Each of these was dismissed. He subsequently filed four separate complaints against the City. This court dismissed the first of these outright. Wilson v. City of Chesapeake, 2015 WL 11116781, at *1-2 (E.D. Va. 2015), aff'd 615 F. App'x 810 (4th Cir. 2015). This court also previously dismissed any claims for hostile work environment and discrimination based on disparate impact.[1] See Order (ECF No. 20); Order, Wilson v. City of Chesapeake, No. 2:16cv629 (E.D. Va. May 26, 2017); Order, Wilson v. City of Chesapeake, No. 2:16cv711 (E.D. Va. May 26, 2017). But Wilson's race and age discrimination claims under Title VII or the Age Discrimination in Employment Act in his other three Complaints survived the City's motions to dismiss.[2] Because the claims remaining in all three Complaints allege overlapping facts, they were consolidated—though not merged together—under the first filed and lead case, No. 2:16cv301. Mem. Order (ECF No. 39).

---

[1] Although Wilson seemed to make disparate impact discrimination claims in two of his three Complaints, these claims were never properly presented to the EEOC. The court therefore dismissed them for lack of subject matter jurisdiction. Order, Wilson v. City of Chesapeake, No. 2:16cv629, at 6-7 (E.D. Va. May 26, 2017); Order, Wilson v. City of Chesapeake, No. 2:16cv711, at 5-7 (E.D. Va. May 26, 2017).

[2] A common theme throughout this litigation has been the difficulty of parsing Wilson's legal arguments. The court has construed his pleadings as liberally as possible to accommodate his lack of counsel. See Brown v. N.C. Dep't of Corr., 612 F.3d 720, 722 (4th Cir. 2010).

**A.    The Chesapeake Fire Department's Fire Promotional Process.**

In 2011, the Chesapeake Fire Department established a new system to select firefighters for promotion to leadership positions within the department.[3] In the Department's Fire Promotional Process ("FPP"), all personnel interested in being considered for promotion are evaluated and ranked against each other at the end of June in every odd-numbered year. When a position opens into which a firefighter could be promoted, the Fire Department offers the position to employees in order of most-qualified to least-qualified. The ranking of the promotion list is achieved using a written examination, an in-person evaluation of a firefighter's responses to various scenarios intended to assess judgment and knowledge, and a review of the firefighter's "professional history synopsis," essentially an assessment of his resume as a fire professional. In the summer of 2015, for instance, 35 firefighters were qualified for promotion to lieutenant and were ranked against each other on the promotion list. Over the next two years, 15 positions opened, and the vacancies were filled by offering them to the highest-ranked firefighters on the promotion list. Stipulations at 3 (ECF No. 63).

One of the significant changes in the new FPP was that, starting with the 2013 promotion cycle, to be considered for advancement to lieutenant, firefighters must have been "released"—certified—to "act out of title" before they could be placed on the promotion list. A firefighter acts out of title by assuming the duties of an absent officer. The onus is on the aspiring officer to train for release to act out of title: there is no requirement that the Department train its firefighters for release to act above their paygrade. Wilson Dep. at 180 (ECF No 53-8). Although the FPP required firefighters to be qualified to act out of title before being placed on the promotion list, there was no quota or minimum amount of acting out of title time required of

---

[3] The City considers "firefighter" a rank rather than a generic term for all employees of the Department. Lieutenant is the rank just above firefighter; captain is senior to lieutenant, and chiefs oversee the captains. In general lieutenants are responsible for managing one shift in one firehouse.

a firefighter before she could be promoted. The FPP was widely advertised in the Department during its roll-out. Fire Department leadership distributed videos to firehouses explaining the new program and made information on the program available to firefighters through the Department's computer network. See Stipulations at 2-3 (ECF No. 63). Wilson knew of the changes to the program and knew that he would have to be released to act out of title to be included in the FPP for 2013. Wilson Dep. at 196 (ECF No. 53-8) (Counsel for the City: "[Y]ou had two years of knowing this qualification was due; is that correct?" Wilson: "Yes.").

**B.    Wilson's Access to Training Generally.**

In response to generalized allegations from Wilson that the City denied him access to training that would have made him more competitive for promotion, the City has summarized his training records, focusing in particular on the training he received in the period since 2011.

Every firefighter employed with CFD has a training "matrix" identifying specific training courses she needs to complete in order to qualify and remain qualified for her specific job. Firefighters are permitted to submit requests to participate in training outside of their matrix to supplement their mandated skills and proficiencies. Training requests are routed through the firefighter's supervising officer at her station, then on to her battalion chief, and finally to the Department's Training Division. The Training Division considers each request, including any comments or recommendations from the firefighter's leadership, and reaches one of three conclusions: she might be permitted to attend the training with the sponsorship of the Department; she might be allowed to attend the training but be required to take leave and pay the costs of the training on her own; or the firefighter might not be allowed to attend the training at all. Stipulations at 14 (ECF No. 63).

Wilson requested to attend and was approved to attend many out-of-matrix courses in the five years since 2011. For some of these, including the Virginia Fire Officer's Academy, the Department funded Wilson's attendance. The city permitted Wilson to attend other courses but did not sponsor them. Still other training requests by Wilson the Department denied entirely. See id. at 14-18.

Wilson has not comprehensively described how or why he feels the Department's handling of his training regimen was inadequate, let alone inadequate due to race or age discrimination. During his deposition, Wilson did say he felt it was unfair that, in 2011, Firefighter Danny Ward[4] was permitted to attend a Juvenile Firesetter class after Wilson's request to attend the same class was denied. Wilson did not explain why he felt Ward was similarly-situated to him, however, or why he was disadvantaged by having to wait to take the course the next year. There is no dispute that Wilson completed the Juvenile Firesetter classes in September and November of 2012. Training Certificates (ECF No. 53-23 at pp. 42-43).

Wilson also appears to argue in his deposition testimony that the Department did more to facilitate training for other firefighters than it did for him. Namely, Wilson said the Department allowed other firefighters to use official vehicles to attend training so they did not have to travel using their personal vehicles. Wilson Dep. at 216-17 (ECF No. 53-8). The City contends this is because firefighters who attend training while on duty are permitted to use official vehicles. Wilson himself was permitted to use an official vehicle to attend a training event in Richmond, Virginia, on September 11, 2015. Stipulations at 18 (ECF No. 63). Wilson has not identified any firefighter who he claims attended training off-duty using an official vehicle.

---

[4] Neither party has directed the court to evidence regarding Danny Ward's age or race.

Capt. Lawrence Matthews, CFD's Training Director, reviewed Wilson's training record. Capt. Matthews said "[Wilson] has received comparable, if not more, training opportunities as similarly-situated younger, white firefighters in the Chesapeake Fire Department."[5] Matthews Aff. at ¶ 11 (ECF No. 53-22).

**C.     Wilson's Training to Be Released to Act out of Title.**

Wilson's primary claims of discrimination relate to the training he received in order to be eligible to act out of title and the number of opportunities he was afforded to act out of title once released. Wilson requested to be considered for promotion in the 2005, 2007, 2011, 2013, and 2017 promotion cycles. He qualified to be included on the promotion list in each cycle, although, because of the new requirement that applicants for promotion be certified to act out of title, Wilson almost missed being included in 2013. With the deadline for certification looming on June 30, 2013, Wilson still had not been released to act out of title.

At some point between May 2011 and August 2012, Wilson first contacted his supervisor, Lt. Duane Daggers, about undergoing the training he needed to qualify to act out of title. Because Wilson was only assigned to Lt. Daggers temporarily for training to recertify as an emergency medical technician, Lt. Daggers refused this request. Wilson Dep. at 185 (ECF No. 53-8). Wilson was subsequently reassigned in August 2012 to a permanent position under Lt. Mark Disharoon at Station 7. In September that year, soon after his re-assignment, Wilson contacted Battalion Chief William Ackiss, the officer with overall responsibility for Station 7 and several others, to ask what the criteria were for being released to act out of title. Ackiss informed him of the need to coordinate training through his direct supervisor, Lt. Disharoon. According to Wilson, Disharoon had previously discouraged Wilson from applying for

---

[5] Neither Wilson nor the City has presented more comprehensive evidence regarding other firefighters' access to out-of-matrix training. Capt. Matthews' assessment is the only evidence before the court comparing Wilson's access to training to other firefighters' across the Department.

promotion, saying, "[A]nybody that wants to be a lieutenant is stupid or retarded." Wilson Aff. at 5, 8 (ECF No. 58-2). Wilson was out of work on medical leave in October and on vacation in November. Because Lt. Disharoon was preparing to retire from the Department in December, Wilson chose not to pursue the training required for release to act out of title until a new lieutenant was assigned to his shift at Station 7. Wilson Dep. at 202-206 (ECF No. 53-7). Shortly thereafter, Chief Ackiss sent Wilson an email explaining the criteria to be released to act out of title. Ackiss Aff. at 2-3 (ECF No. 53-6).

Lt. Jerry Bohn was assigned to manage Wilson's shift at Station 7 in January 2013. By the City's own admission, he was a tough officer. Bohn and Wilson had a tense relationship, making the other personnel on their shift uncomfortable with "constant loud arguments."[6] After Bohn learned Wilson hoped to be included on the promotion list during the 2013 cycle, Bohn discouraged Wilson from pursuing the promotion. Wilson still sought to be considered for promotion, though he knew he remained ineligible to be included on the list because he had not been released to act out of title. Therefore, in May 2013,[7] he met with Bohn and Ackiss to discuss training necessary to be released in time for the June 30, 2013, deadline to be included in that year's FPP cycle. Although the training needed for release to act out of title is usually undertaken over the course of six months or a year, Chief Ackiss agreed to allow Wilson to complete the training on a much-compressed timeline. He intended for Wilson to receive his certification before the June 30, 2013, deadline for inclusion on the promotion list for the next two-year cycle. Bohn disagreed with this course of action, but at Ackiss' direction, Bohn began training Wilson until Bohn was transferred away from Station 7 in early June. Ackiss directed

---

[6] Wilson offers no evidence that this antagonism was due to Wilson's race or age. Indeed, other firefighters also complained regarding Bohn's leadership style. See, e.g., Kreisel Aff. at 2 (ECF No. 45-1).

[7] During his deposition, Wilson offered no explanation about why he waited so long after Bohn's assignment to Station 7 to seek him out for training. Wilson Dep. at 206 (ECF No. 53-7).

7

several other officers to continue Wilson's training. Ackiss Aff. at 6(ECF No. 53-6). Chief Ackiss monitored Wilson's training until, on June 28, 2013, Chief Ackiss released Wilson to act out of title. Wilson does not dispute that he received the training necessary to act out of title and was therefore eligible for the 2013 FPP, but he contends he was discriminated against by having to complete the training on an accelerated basis. Wilson Aff. at 18 (ECF No. 58-2). This allegation was the basis for his first charge to the EEOC in July 2013. Charge of Discrimination (July 12, 2013) (ECF No. 53-14).

## C. Wilson's Difficulties Getting Time as Acting Officer.

Wilson's claims he was denied opportunities to serve as the acting officer in charge of a shift. He appears to argue this constitutes a denial of training he needed to compete for promotion. Wilson makes both "macro" and "micro" claims that he was denied such training opportunities. Out of all employees in the Department, he has identified several younger, white colleagues whom he alleges have received more acting out of title opportunities over the course of the four years since he was released to act out of title. He has also identified three discrete incidents in which he says he was denied an opportunity to act out of title. Although it is not clear why, Wilson has implied that these denials related to his race or age.

On the macro level, Wilson has identified many firefighters in the department who, between June 30, 2013 and November 1, 2017, acted out of title more times than he did. According to records Wilson generated using CFD's human resources records,[8] he has acted out of title on 45 occasions over that time. Spreadsheet, Ex. 8 to Wilson Dep. (ECF No. 53-9, 53-10). In that same period, other firefighters have acted out of title over one hundred times. Still

---

[8] Although the city does not maintain a record of how much time each employee has spent acting out of title, Wilson has assembled a spreadsheet containing this information from the city's personnel scheduling system. The City does not dispute the accuracy of the spreadsheet. Accordingly, the court accepts it as admissible for the purposes of resolving this motion either as a business record itself or as a summary of business records. See Fed. R. Evid. 803(6)(b), 1006.

others have acted out of title far fewer times than Wilson. The exhibit itself does not establish that any of the firefighters are younger than Wilson or caucasian. However, in Wilson's declaration, he identifies three firefighters who are younger and caucasian and did, according to his spreadsheet, spend more time acting out of title than he did. Wilson Aff. at 23 (ECF No. 58-2). According to Wilson's spreadsheet, Brian Atkins acted out of title 132 times, Jeremy Brittenham 100 times, and Bryan Soriano 104 times since June 30, 2013. Id.; Spreadsheet, Ex. 8 to Wilson Dep. (ECF No. 53-9, 53-10). Wilson does not allege any of these firefighters was assigned to Station 7 where Wilson worked or reported to the same supervisor as Wilson. Notably, the only other firefighters released to act out of title and assigned to Wilson's shift at Station 7 were Firefighter William Copeland, who acted out of title seven times, and Firefighter Nicholas Novellino, who acted out of title 60 times according to Wilson's spreadsheet. Id.

The City's declarations contend that opportunities to act out of title only arise when an officer is unavailable to manage a shift. The number of opportunities therefore varies widely from station-to-station and shift-to-shift based on the officers' scheduled leave, training, and even sickness. Wilson Dep. at 123-124 (ECF No. 53-7). Although opportunities to act out for short absences generally rotated between released firefighters, when an officer was going to be absent for more than a few hours or days, her position was offered to the firefighters on the promotion list in descending order based on their ranking. Hoag Aff. at 5 (ECF No. 53-11). No long-term acting out of title opportunity has been offered to Wilson because he never ranked highly enough on the promotion list to be offered one. Id.

On the micro level, Wilson has also identified three occasions in which felt he should have been allowed to act out of title but was kept from doing so allegedly because of his race or his age. In the first, on September 25, 2013, Station 7 was so short-staffed that they were unable

to man all of their vehicles. The lieutenant who succeeded Bohn, Lt. Francis Cherry, was not on duty, so Wilson assumed he would be assigned as the acting officer. Notwithstanding Wilson's belief, Chief Ackiss assigned a firefighter from another station, Fred Harris, to allow them to sufficiently staff the shift. Fred Harris had been released previously to act out of title at his home station, and Chief Ackiss knew Station 7's fire engine had unique handling on the backroads that make up Station 7's area of responsibility. Because Harris had no experience driving the unusual fire engine on the unusually difficult roads around the Station, Ackiss assigned Harris to be acting officer, allowing Wilson to drive the fire engine Harris had no experience with. Ackiss Aff. at 7 (ECF No. 53-6). Like Wilson, Harris is a black man over the age of 40. Harris Aff. (ECF No. 53-16). This incident led to Wilson lodging his second charge with the EEOC. Charge of Discrimination (Jan. 13, 2014) (ECF No. 53-17).

In the second incident, on January 29, 2014, Wilson had been scheduled to attend a training session away from Station 7. Lt. Cherry and all other firefighters released to act out of title were on leave that day, so Chief Ackiss assigned Thomas Ricardi, a firefighter from a different station who was released to act out of title, to supervise the shift at Station 7. Ricardi is a white man over the age of 40. Stipulations at 10-11 (ECF No. 63). When a snowstorm came up that forced the cancellation of Wilson's class, he reported to Station 7 for duty instead of going to the cancelled training. Ricardi served as acting officer over Wilson and the rest of the firefighters on shift for approximately two to three hours before Chief Ackiss realized he had more firefighters qualified to act out of title at the station than he needed, put Wilson in charge of the shift, and moved Ricardi to another station. Id. at 10; Ackiss Aff. at 8-10 (ECF No. 53-6). This incident led Wilson to lodge his third charge with the EEOC. Charge of Discrimination (July 14, 2014) (ECF No. 53-20).

In the third incident, on October 24, 2014, Lt. Cherry called out sick. By the informal rotation of the firefighters released to act out of title at the station, it was Wilson's turn to serve as acting officer. Firefighter William Copeland, one of the other personnel on Wilson's shift released to act out of title, mistakenly assumed the role of acting officer because he did not know about the rotation. Copeland is a white male over the age of 40. Copeland Aff. (ECF No. 53-13). There is no evidence from the parties that Wilson objected to Copeland's assuming the acting officer role. Id.; Wilson Aff. at 22-23 (ECF No. 58-2). Part of the way through the day, Copeland realized his mistake and offered to let Wilson take his next acting out of title opportunity since Copeland had taken Wilson's on that day. Wilson seemed upset with the error but acquiesced to Copeland acting out of title for the day. Copeland Aff. (ECF No. 53-13).

**D.    Wilson's 2015 Performance Evaluation.**

Wilson also takes issue with a comment entered in the performance evaluation he received from his supervisor in 2015. In that evaluation, his supervisor, Lt. Cherry[9] made a note about the October 24, 2014, incident between Copeland and Wilson regarding whose turn it was to act out of title. Cherry wrote,

> [D]uring this last evaluation period there was an issue with acting officer information that was not appropriately passed on and as a result there was an issue with who should have acted on that particular day. The firefighter that did act was unaware of the acting rotation that had been reiterated at an earlier shift meeting because he was out on sick leave. Upon my return to duty it was necessary to call a shift meeting to reinforce the importance of crew responsibilities no matter who is on duty. This incident directly effected [sic] company cohesiveness and given the time and experience level of this crew there in [sic] no room for future incidents of this nature. With that being said, since the occurrence of that incident, all parties have moved forward to improve company cohesion.

---

[9] Lt. Cherry was a black male also over the age of 40. Stipulations at 4 (ECF No. 63). Unfortunately, he passed away prior to discovery commencing in the litigation.

Performance Evaluation (Apr. 23, 2015) (ECF No. 53-28). Wilson took these remarks badly. Although he admits his overall evaluation in 2015 was "strong," Wilson Deposition at 225 (ECF No. 53-9), he blames this comment for his being passed over for a merit-based pay raise and not selected for promotion. Am. Compl., Wilson, No. 2:16cv711, at 5 (Feb. 16, 2017); Charge of Discrimination, Ex. 5 to Compl., Wilson, No. 2:16cv711, at 5 (Feb. 16 2016) (ECF No. 1-5). The City has produced evidence—which Wilson has been unable to contradict—that his evaluation in 2015 played no part in the Department's deciding not to award Wilson a merit-based pay increase or in any iteration of the FPP. See Stipulations at 21 (ECF No. 63).

The City maintains a Merit Pay Program to reward high-performing employees. For its portion of the program, the Fire Department selects personnel for a merit-based pay raise on the basis of a nomination from another member of the Department. Once a nomination is submitted, the nominee's supervisors must then endorse the nomination either favorably or unfavorably. Id. at 20. In the Operations Division, the division to which Wilson was assigned, the battalion chiefs meet to consider the nominations submitted from their organization. Of particular importance to this case, the battalion chiefs in the Operations Division do not consider the performance evaluations of the nominees. The battalion chiefs choose nominations to forward on to the second-in-command of the department, the Deputy Fire Chief. The Deputy Fire Chief screens the nominations forwarded to him to ensure the employees meet the minimum requirements for a merit-based pay raise, one of which is that their performance evaluation rating be at least "Solid Performance."[10] The Deputy Fire Chief then presents the nominations to the

---

[10] CFD's performance evaluation scores are based on a supervisor assigning numerical scores from 1 to 5 in a variety of performance categories, including "driving skills and knowledge of fire district," "participation in study and training programs," and "physical fitness," among others. These scores are assigned a weight and then averaged to produce an overall score from 1 to 5. The overall score will fall within one of five descriptive performance rating categories. "Unsatisfactory performance" is the lowest, and "outstanding performance" is the highest. A firefighter must have a performance evaluation score in the "solid performance" range or higher to be eligible for a merit-based

Fire Chief, who chooses the final nominees to be submitted for the City Manager's ultimate decision who will receive a merit-based pay raise. Stipulations at 20 (ECF No. 63).

Wilson's 2015 nomination had a convoluted path. An officer from outside Wilson's shift and station, Lt. Joyce Jenkins, submitted a nomination for him on the day of the deadline for nominations. Because the nomination was submitted so close to the deadline, Wilson's immediate supervisor, Lt. Cherry, did not have time to complete a written endorsement on the nomination before Battalion Chief Ackiss and Division Chief Ellis reviewed it. Both chiefs recommended that Wilson's nomination not go further in the nominating process. When the battalion chiefs met to consider the nominations, they called Lt. Cherry for his input on Wilson's nomination. Lt. Cherry concurred with Wilson's nomination, but was not "enthusiastic" in his concurrence. Wooten Aff. at ¶ 4 (ECF No. 53-15). The panel of battalion chiefs decided not to forward Wilson's nomination to the Deputy Fire Chief. Again, the panel reached this decision without reviewing Wilson's—or anyone else's—2015 performance evaluation. Ackiss Aff. at 15 (ECF No. 53-6); Wooten Aff. (ECF No. 53-15).

The Deputy Fire Chief, as a part of his screening of the nominees for the merit-based pay raise, compiled a list of all nominees and their basic employee information. He included the performance evaluation score—though not the performance evaluation narrative comments—for all nominated employees to ensure their scores were in the "Solid Performance" range or higher. The Deputy Fire Chief did not include Wilson's score because, as a result of the nomination having been submitted so late, the score had not been submitted as a part of Wilson's nomination package. Because the panel of battalion chiefs had chosen not to send Wilson's nomination to

---

pay raise. "Solid performance" is a numerical score of 2.75 to 3.74. See Wilson Performance Evaluations (ECF No. 53-26 to 53-28); Fermil Aff. (ECF No. 53-29).

13

the Fire Chief, the Deputy Chief did not fill out this field for Wilson by reaching out to Chief Ackiss or Lt. Cherry for the performance evaluation score. Fermil Aff. (ECF No. 53-29).

Wilson's 2015 performance evaluation was also unrelated to his low-ranking on the 2015 and 2017 promotion lists. The FPP ranks firefighters on the basis of a written examination, a review of a candidate's video-taped performance in assessment exercises, and a review of the firefighter's "Professional History Synopsis." (ECF No. 53-3). None of these three pieces of the evaluation includes a consideration of the firefighter's performance evaluations. The fact that Wilson was not ranked higher on the 2015 and 2017 promotion lists has to do with his performance in these three assessments, not on the performance evaluation Lt. Cherry gave him in 2015. Fire Promotional Policy (ECF No. 53-3).

**E.     Wilson's Evidence of Incidents Unrelated to His Complaints.**

In his declaration, Wilson also goes into some detail regarding two incidents that appear unrelated to any of the allegations presently before the court. The first was his failure to properly recertify as an Emergency Medical Technician-Enhanced in 2010. Wilson Aff. at 9-13 (ECF No. 58-2). Wilson appears to claim the city discriminated against him because of his age or race by failing to ensure that he attend a course in 2009 to recertify as an Emergency Medical Technician-Enhanced. Id. Because Wilson neglected to attend the course, his certification lapsed. Although certification was a job requirement, Wilson was not let go or furloughed but was required to attend additional training to restore his certification. See Id.

The second incident Wilson complains of concerns his interaction with the family of a deceased patient he transferred to a hospital. Id. at 14-16. The hospital staff complained to the Department that Wilson had inappropriately communicated to the family that the patient had died, contravening the hospital's notification procedures. Wilson denies that told the family of

14

their relative's passing, but he did offer to pray with them. Hospital officials who witnessed the prayers surmised that Wilson had informed the family. Wilson claims the counseling letter he received afterwards was a result of animus against him because of his age or race. Id.

Neither of these incidents relates to the claims Wilson raised in his Complaints or in any of his four previous charges of discrimination. See Am. Compl. (ECF No. 8); Third Am. Compl., Wilson v. City of Chesapeake, No 2:16cv629 (E.D. Va. Feb. 16, 2017); Am. Compl., Wilson v. City of Chesapeake, No 2:16cv711 (E.D. Va. Feb. 16, 2017). In addition, Wilson's unrebutted descriptions of each incident provide no evidence that either one related to his race or age. Consequently, the court does not consider them in its resolution of the City's present Motion for Summary Judgment (ECF No. 52) on the consolidated case.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis of its motion and identifying materials in the record it believes demonstrates the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 322-25. When the moving party has met its burden to show that the evidence is insufficient to support the

nonmoving party's case, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see also Anderson, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

### III.   ANALYSIS

#### A.   Title VII and ADEA Claims of Disparate Treatment Due to Race or Age.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(l). Similarly, the ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); see also Gross v. FBL Fin. Servs., 557 U.S. 167, 170 (2009). As discussed above, Wilson's EEOC charges did not assert claims for disparate impact. As a result, to the extent any of his Complaints can be construed to allege a disparate impact violation, such claims were dismissed previously in the case. 42 U.S.C. § 2000e-5(f)(1); 29 U.S.C. § 626(d)(1); Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 407 (4th Cir. 2013) ("[After an EEOC complaint, in] any subsequent lawsuit

16

alleging unlawful employment practices under Title VII, a federal court may only consider those allegations included in the EEOC charge."); Order, <u>Wilson v. City of Chesapeake</u>, No. 2:16cv629, at 6-7 (E.D. Va. May 26, 2017); Order, <u>Wilson v. City of Chesapeake</u>, No. 2:16cv711, at 5-7 (E.D. Va. May 26, 2017). He is therefore limited to his disparate treatment and retaliation claims.

To state a prima facie claim of disparate treatment due to race or age discrimination, Wilson must show (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) more favorable treatment of someone outside the protected class with comparable qualifications. <u>Arthur v. Pet Dairy</u>, 593 Fed. Appx. 211, 219 (4th Cir. 2015); <u>Coleman v. Md. Ct. App.</u>, 626 F.3d 187,190 (4th Cir. 2010); <u>Goode v. Cent. Va. Legal Aid Soc'y</u>, 807 F.3d 619, 626 (E.D. Va. 2014) (citing <u>Causey v. Balog</u>, 162 F.3d 795, 802 (4th Cir. 1998)).

The City's extensively documented Summary Judgment Motion asserts that Wilson has not suffered any adverse employment action, and to the extent any action was adverse, he has not produced any evidence of discrimination. To proceed to trial on his Title VII and AEDA claims, Wilson must produce sufficient evidence from which a reasonable juror could conclude that the City's actions were detrimental to his employment and due to Wilson's race or age. <u>Young v. Lehman</u>, 748 F.2d 194, 196 (4th Cir. 1984). This evidence may be either direct or indirect. Direct evidence includes such things as discriminatory statements made by a relevant decision maker from which a jury could infer a discriminatory motive. <u>Taylor v. Va. Union Univ.</u>, 193 F.3d 219, 232 (4th Cir. 1999) (<u>en banc</u>). Indirect proof requires evidence on all of the elements of Plaintiff's prima facie case of discrimination. Under this theory, Wilson has the burden to establish (1) that he is a member of a protected class; (2) that he suffered an adverse employment

action; (3) that he was performing his position at a level that met CFD's legitimate expectations, and (4) that similarly situated employees outside the protected class received more favorable treatment. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Coleman, 626 F.3d at 190.

If Wilson succeeds in establishing a prima facie case of discrimination, the burden shifts to the City to articulate a legitimate nondiscriminatory reason for his firing. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004). If the City meets this burden, Wilson must then introduce sufficient evidence from which a jury could conclude that the City's stated reason was merely a pretext for its intentional discrimination. McDonnell Douglas, 411 U.S. at 804. "A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000).

Wilson offers no direct evidence of discrimination against him. Throughout the allegations in all three Complaints and his 70-page declaration, he has presented no evidence of derogatory statements, writings, or actions by his supervisors or colleagues which were explicitly based on his race or age. To be sure, Wilson attributes a racial or age-based motive to the acts underlying his Complaints. His pleadings are rife with provocative language describing his alleged mistreatment, some of it racially-tinged.[11] But none of these statements is attributed to a co-worker or supervisor. By contrast, the City has produced evidence that no such statements or conduct occurred. Copeland Aff. (ECF No. 53-13); Kreisel Aff. at 1, 4 (ECF No. 54-1). Because Wilson has no direct evidence of discrimination, he must rely on the McDonnel

---

[11] E.g. Pl.'s Show Cause to Deny Att'y's Fees at 2 (ECF No. 50) ("While growing up, Plaintiff have [sic] learned how not to oppose whites in white persons' authority, because generally whites have retaliated against Plaintiff.").

Douglas burden-shifting framework to prove disparate treatment by indirect evidence. But his indirect evidence of discrimination is likewise insufficient.

The City concedes Wilson meets the first two factors of the McDonnel Douglas test. Wilson is a member of a protected class—due to either his age or his race—and his work performance over the course of his employment has been satisfactory. Def.'s Mem. at 32 (ECF No. 53). The City's Motion therefore turns on elements three and four: whether Wilson has offered evidence from which a reasonable juror conclude that he suffered an adverse employment action and that similarly-situated younger or white peers received more favorable treatment.

An adverse employment action is one that negatively affects the "'terms, conditions, or benefits' of the plaintiff's employment." Richardson v. Richland Cty. Sch. Dist., 52 F. App'x 615, 616 (4th Cir. 2002) (citing Von Gunten v. Maryland, 243 F.3d 858, 866 (4th Cir. 2001), rev'd on other grounds, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)). In the typical case for employment discrimination, an adverse employment action comes in the form of "an ultimate employment decision," i.e. hiring, firing, demotion, or nonselection for promotion. See Peary v. Goss, 365 F. Supp. 2d 713, 722 (E.D. Va. 2005) (citing Von Gunten, 243 F.3d at 865). But less severe action may qualify as an adverse employment action if it "adversely affected 'the terms, conditions, or benefits' of the plaintiff's employment." Von Gunten, 243 F.3d at 865 (citing Munday v. Waste Mgmt. of North America, Inc., 126 F.3d 239, 242 (4th Cir. 1997)). Simply because an employee finds a decision by her employer unappealing does not make that decision a qualifying adverse employment action. For instance, requiring an employee to use a personal vehicle for work travel even though she would be reimbursed for doing so was not an adverse employment action. Von Gunten, 243 F.3d at 867. A negative rating on an

employee evaluation that did not impact the employer's decision to award her a raise was not an adverse employment action. Id. at 868. Reassigning an employee to a less-pleasant work location that did not result in a salary decrease, hinder her advancement, or put her in any added physical peril is not an adverse employment action. Peary, 365 F. Supp. 2d at 723-26. The statute itself fixes the only bright line rule, but absent demotion, firing, or the failure to hire and promote, other adverse employment actions must generally impact an employee's pay, potential for continued employment, or likelihood of promotion within the organization.

In addition to identifying an adverse employment action, for each one identified, a proper comparator under McDonnel Douglas must be "similar in all relevant respects." Haywood v. Locke, 387 Fed. App'x 355, 359 (4th Cir. 2010). To provide indirect evidence of discrimination, the comparator must have "dealt with the same supervisor, [been] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Id. (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). And, of course, the comparator must have been treated more favorably than the Plaintiff with respect to the adverse action complained of. Haywood, 387 Fed. App'x at 359.

The failure to establish a dispute of material fact on either the adverse employment action or the comparator elements would be fatal to Wilson's case. Coleman, 626 F.3d at 190. As Wilson's claims fall into four factual categories, the court will take them each in turn to determine whether he has offered evidence creating a dispute of fact necessitating a trial on either of these two elements.

1.    Denial of General Training Opportunities.

Wilson claims that he was denied opportunities to attend training courses and, as a consequence, was less competitive for promotion to lieutenant during the biannual FPP cycles. The only evidence[12] he offered during the litigation substantiating this claim was the observation that a firefighter named Danny Ward[13] was approved to attend a specific training course in 2011. Wilson testified he had asked to attend the same course in 2011 but that this request was refused. His records reflect he was able to attend the course a year later.

Wilson offers no explanation for why he believes Ward was sufficiently similarly situated to be a proper comparator. Nor does he explain why he believes attending this single course in 2011 would have increased his chances of promotion with CFD. Thus his evidence that he was provided this training later does not amount to an adverse employment action, and Ward is not a proper comparator.

Wilson also does not explain why he would have been promoted if he had taken this one class in 2011, particularly when he attended the same course the next year and also attended many other training courses. See Stipulations at 14-18 (ECF No. 63); Matthews Aff. at ¶ 11 (ECF No. 53-22) ("[Wilson] has received comparable, if not more, training opportunities as similarly-situated younger, white firefighters in the Chesapeake Fire Department."). Because he failed to establish these two elements under the McDonnel Douglas analysis, Wilson has offered no evidence from which a reasonable juror conclude that he was discriminated against by being denied access to general training opportunities because of his race or age.

---

[12] The only other evidence offered from either party comparing Wilson's training record to other firefighters' is from CFD's training director, Capt. Lawrence Matthews. Capt. Matthews opined that Wilson "has received comparable, if not more, training opportunities as similarly-situated younger white firefighters in [CFD]." Matthews Aff. (ECF No. 53-22).

[13] To reiterate, the court is forced to assume without evidence from the parties that Ward is not a member of a protected class under Title VII or ADEA.

2.    Abbreviated Training Plan in Preparation to Act out of Title.

Wilson also asserts he was forced to complete his training to act out of title in too short a period of time for the training to be effective. Wilson Aff. at 18-19 (ECF No. 58-2). He apparently claims he would have been more competitive for promotion if he had been trained over the normal months or years a CFD firefighter usually takes to get released rather than the six weeks he took to do it under Chief Ackiss' supervision.

Wilson's argument falls short for three reasons. First, he again identifies no proper comparator, simply averring, "the normal policy stated that training would take six months to two years." Wilson Aff. at 18 (ECF No. 58-2). Even assuming that, by implicitly naming all firefighters in the department released to act out of title, Wilson had properly identified a similarly situated comparator, he again fails to explain how the training he did receive was so inadequate that it kept him from being properly qualified to compete for promotion. He offers no evidence or argument to explain why the accelerated nature of the training program made it deficient. He therefore fails to create a dispute of material fact as to whether he was subject to an adverse employment action at all on this claim.

Additionally, even if he had raised a dispute of fact as to the two McDonnel Douglas elements, Wilson fails to acknowledge that the compressed timeline for being released to act out of title was due in large part to his own decision not to pursue training to act out of title earlier. Wilson Dep. at 180 (ECF No 53-8) (Counsel for the City: "[D]o you agree . . . that it's the firefighter's responsibility to pursue opportunities toward being released to serve as acting officer?" Wilson: "Yeah, I guess it would be."). He has offered no evidence to rebut this legitimate, non-discriminatory reason for his shortened training period or to suggest that it was a pretext on the City's part to deny him a training opportunity because of his race or age.

3.    Limited Number of Opportunities to Act out of Title.

As explained above, Wilson makes two different arguments about being denied opportunities to act out of title.

At the departmental level, he identifies several firefighters who he alleges are younger than him, white, and received more opportunities to act out of title. Since June 30, 2013, Brian Atkins acted out of title 132 times, Jeremy Brittenham 100 times, and Bryan Soriano 104 times. Spreadsheet, Ex. 8 to Wilson Dep. (ECF No. 53-9, 53-10). Although not asserted directly, the court infers that Wilson believes that these firefighters' experience acting out of title prepared them better for promotion selection than his schedule of 45 shifts acting out of title. But even if the court were to assume that having more acting out of title opportunities is sufficient to have made a material impact on a firefighter's training for promotion, Wilson still fails to explain why these three firefighters are comparators under the McDonnel Douglas framework. A proper comparator must have "dealt with the same supervisor, [been] subject to the same standards and . . . engaged in the same conduct." Haywood, 387 Fed. App'x 355, 359. The City has produced evidence that these three firefighters were assigned to different stations and worked for different supervisors than Wilson. See Stipulations at 13 (ECF No. 63). And Wilson has acknowledged that these different circumstances would bear on the number of acting out of title opportunities each firefighter received. Wilson Dep. at 123-124 (ECF No. 53-7). Because the alleged comparators had significantly different circumstances of employment with the City, they are not proper comparators. Wilson offers no contrary evidence.

Wilson also offers three incidents in which he says he was denied a discrete opportunity to act out of title because of his age or race. The greatest flaw in Wilson's argument here is that he fails to articulate any basis to conclude that these three discrete instances of acting out of title

opportunities had any material impact on the terms and conditions of his employment. When a firefighter serves as the acting officer in charge of the shift is practical experience of the position to which she or he aspires. Wilson offers no reason why he would have been more competitive for promotion if he had any one or all three of these extra shifts of acting out of title experience. Therefore, Wilson has failed to explain how any of these discrete incidents qualify as adverse employment actions requiring relief under Title VII or the ADEA. They do not.

Additionally, because one of the incidents involved Harris, a black man over the age of 40, only Ricardi and Copeland may serve as proper comparators for Wilson. See White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004). While Ricardi and Copeland are both caucasian, only Copeland served under the same supervisor as Wilson. Thus only Copeland is a potentially proper comparator. See, e.g., Haywood, 387 Fed. App'x at 359. However, with respect to both incidents, the City has offered legitimate, nondiscriminatory reasons why Ricardi and Copeland acted out of title for the shifts in question. In the case of Ricardi, Wilson was not scheduled to work. When his supervisor learned Wilson had come to work, Wilson was promptly designated as acting officer for the shift. The circumstances of Copeland's acting out of title conflict were reviewed in detail by Wilson's supervisor, Lt. Cherry. He concluded the mishap resulted from a miscommunication. See Wilson Performance Evaluations (ECF No. 53-26 to 53-28). Wilson provides no contrary evidence. In fact, he has not contradicted Copeland's statement that Wilson essentially acquiesced to the shift assignment when Copeland offered to allow him the next acting out of title opportunity to make up for the error. Copeland Aff. (ECF No. 53-13).

4.    2015 Performance Evaluation Comments.

On this claim, Wilson takes issue with a comment Lt. Cherry included in Wilson's 2015 performance evaluation, writing that Wilson needed to improve his communication skills. The comment arose from Wilson's conflict with Copeland over the October 24, 2014, acting out of title shift. Wilson asserts that this comment was responsible for him being passed over both for a merit based pay raise and for promotion.

As with all of his allegations, Wilson has offered no evidence that his 2015 performance evaluation had anything to do with his race or age. Chief Ackiss, Cherry's supervisor, has averred that, on the basis of his communications with Lt. Cherry about the evaluation, he felt the comment was a "fair and appropriate" treatment of Wilson's performance. See Ackiss Aff. at 13 (ECF No. 53-6). On the issue of comparators, Wilson identifies no firefighter in the Department who, after engaging in conduct like the communication failure for which Wilson was counseled, was not also critiqued in their performance review. Accordingly, Wilson fails to identify any evidence creating a dispute of fact as to the existence of a proper comparator.

Also, Wilson has offered no evidence to rebut the City's evidence that the comments had no impact on his being passed over for a merit based pay raise or promotion. This is strong evidence that the comments were not an adverse employment action. In Van Gunten, the employee still received a pay raise in spite of an allegedly unfair score on a performance evaluation. 243 F.3d at 867. A negative rating on the employee's evaluation that did not impact the employer's decision to award a raise was not an adverse employment action. Id. at 868. That score was not an adverse employment action because it did not have an adverse impact on the employee's pay. Similarly here, Wilson offers nothing to suggest the derogatory comments had an effect on his pay or his promotion potential. The City has specifically declared that it did

not. See Stipulations at 21, ¶ 77 (ECF No. 63) (Wilson and the City agree "the [merit pay] panel did not consider or review Wilson's—or anyone else's—2015 performance evaluation."); Fire Promotional Policy (ECF No. 53-3) (no consideration of annual performance evaluations in FPP). As a result, it was not an adverse employment action entitling him to relief under either Title VII or ADEA.

## B. Title VII Retaliation Claims

In addition to his claims of disparate impact on the basis of his race or age, Wilson claims he was retaliated against because of his complaints to the EEOC and multiple law suits against the City. As with his discrimination complaints, Wilson's retaliation claims are not stated with precision. Instead, he has essentially assigned an additional retaliatory motive to every allegedly discriminatory act after his first complaint to the EEOC. Since his claims of inadequate access to acting out of title opportunities and unfairly adverse comments on his 2015 performance evaluation were the only alleged bad acts to have occurred after he filed his first EEOC complaint, the court only examines these claims against Title VII's retaliation provision. 42 U.S.C. § 2000e-3(a). Even resolving disputes of fact in favor of Wilson, as required on a summary judgment motion, he has not presented sufficient evidence to survive summary judgment on his retaliation claim.

Title VII's anti-retaliation provision was enacted to "prevent an employer from interfering [through retaliation] with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." Burlington N. & Santa Fe Ry. Co. v. White, 540 U.S. 53, 63 (2006). To survive summary judgment on his retaliation claim, Wilson must offer evidence creating a conflict of fact as to three elements: (1) that he engaged in protected activity; (2) that his employer took materially adverse action against him; and (3) that there was a causal link

26

between these two events. Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015) (en banc). Protected activity includes activity which opposes any practice made unlawful under Title VII. DeMasters v. Carilion Clinic, 796 F.3d 409, 416 (4th Cir. 2015). The Fourth Circuit gives a generous interpretation to alleged opposition conduct. Thus, "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." DeMasters, 796 F.3d at 420 (quoting Crawford v. Metro Gov't of Nashville and Davidson Cty., 555 U.S. 271, 281-82 (2009) (Alito, J., concurring)).

For the first element, it is undisputed that Wilson engaged in protected activity. The filing of an EEOC charge of discrimination or a lawsuit are quintessentially protected activity. See 42 U.S.C. § 2000e-3; Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 656 (4th Cir. 1998); Harrison v. S.C. Dep't of Mental Health, 641 F. App'x 202, 207 (4th Cir. 2015) ("[T]here is no question that [by bringing a lawsuit] for failure to promote and pay discrimination based on race, the plaintiffs engaged in exactly the kind of activity that Title VII protects against a retaliatory response.").

But Wilson's evidence cannot satisfy the second or third elements of retaliation claims. In the context of a retaliation claim, the standard for a materially adverse action is lower than that for a Title VII or ADEA disparate treatment claim: the action must only have been of the type that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." White, 548 U.S. at 68; see also Emami v. Bolden, 241 F. Supp. 3d 673, 684-85 (E.D. Va. 2017) (observing that the "materially adverse action" standard for a retaliation claim is broader than the "adverse employment action" standard in a claim for disparate treatment).

Notwithstanding the more generous standard for a materially adverse action, a reprimand, without some collateral consequence, cannot be an adequate basis for a retaliation claim. "A negative performance review, alone . . . does not constitute a materially adverse action." Emami, 241 F. Supp. 3d at 685. As discussed above, Wilson has failed to offer evidence suggesting he suffered some loss because of the allegedly negative comment he received in his 2015 performance evaluation. The evaluation played no part in either the Department's passing over him for a merit pay increase or for his low rank on the promotion list. See Stipulations at 21, ¶ 77 (ECF No. 63) (Wilson and the City agree "the [merit pay] panel did not consider or review Wilson's—or anyone else's—2015 performance evaluation."); Fire Promotional Policy (ECF No. 53-3) (no consideration of annual performance evaluations in FPP). Like a reprimand without collateral consequences, such a negative comment without an effect on pay or promotion is not a materially adverse action. Similarly, because he has not explained how being given marginally fewer opportunities to act out of title than some of his colleagues impacted his potential for promotion, being denied opportunities to act out of title is more akin to the annoyances "all employees experience" than to an act which would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." See White, 548 U.S. at 68. Because he has not offered any evidence from which a reasonable juror could conclude Wilson was subject to actions by the Department that would have dissuaded a reasonable employee from lodging a complaint of discrimination, his retaliation claim fails to meet the second element.

Finally, Wilson's retaliation claim decisively fails on the third element. He has not produced any evidence from which jurors could conclude the first two elements were causally connected. The City has offered non-retaliatory explanations for all of the actions Wilson has identified. Ackiss Aff. at 12 (ECF No. 53-6) ("Despite Wilson's protestations that the comments

were negative and that they led to a drop in his overall performance rating, they appeared to be extremely fair and honest."); Hoag Aff. at 5 (ECF No. 53-11) (long term acting out of title opportunities only given to firefighters ranked top on the promotion list); Wilson Dep. at 123-124 (ECF No. 53-7) (wide variation to access to opportunities to act out of title due to officers' schedules of leave, training, and sickness—and such variation not accounted for in spreadsheet showing total number of acting out opportunities). A negative comment cannot have been retaliatory if it was true, and Wilson offers nothing to suggest the non-retaliatory explanation was pretextual, such as evidence that similarly-situated firefighters who engaged in similar behavior were not subsequently criticized in their evaluations. Also, the City it has explained that the number acting out of title opportunities varies widely from station to station and shift to shift. Wilson also fails to offer evidence that this reason is pretextual.

Because Wilson has not offered evidence that the City's allegedly retaliatory actions were not materially adverse to him or driven by a desire to retaliate against him for making use of EEO adjudication procedures, Wilson's retaliation claims cannot survive summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, the City's Motion for Summary Judgment (ECF NO. 52) is GRANTED, and the Clerk shall enter judgment in favor of the Defendant City of Chesapeake on all three Complaints in the consolidated case.

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

February 12, 2018
Norfolk, Virginia